drawing of the lottery was completed. The defendants then proved by a competent witness, that at the conclusion of the drawing of the lottery, there was found in one of the wheels fourteen blanks and prizes against which there were no corresponding numbers remaining in the other wheel; that the managers then concluded to draw the lottery over again. That on the second drawing, before the wheels were exhausted, several mistakes were detected in the second drawing by them, there being duplicates of the numbers drawn from one of the wheels. That the managers discontinued the second drawing, and commenced a third drawing; on which third drawing the blanks and prizes and numbers came out even, and that neither on the second nor third drawing was the prize claimed by the plaintiff drawn by him. The plaintiff then prayed the opinion of the court to the jury, that if they shall find from the evidence that the numbers, and blanks and prizes, were all put in the wheels before the drawing commenced, and that the drawing of the lottery was regularly begun according to law, and that the said ticket No. 3626 drew the prize of $800, that then the plaintiff is entitled to recover. Which opinion the court, [*Buchanan*, Ch. J. and *Clagett* and *Shriver* A. J.] refused to give. The plaintiff excepted; and the verdict and judgment being for the defendants, the plaintiff appealed to this court.

The cause was argued before POLK, EARLE, and JOHNSON, J. by

*Taney* and *Brooke*, for the Appellant; and by
*Warfield*, for the Appellee.

JUDGMENT AFFIRMED.

---

## BURGESS vs. GUN.

APPEAL from *Baltimore* County Court. This was an action of replevin for 110 hhds. of tobacco, marked C. The defendant, (now appellant,) pleaded properly. The facts were admitted at the trial to be these—*Alexander*

In replevin for tobacco, it appeared that an agreement was entered into between A M and H G, to execute a charter party for a vessel, the defendant captain, from B to A, but which charter party was never executed. That H G put on board the vessel the tobacco, and afterwards sold the same to the plaintiff, and gave an order for it on the defendant, who refused to deliver it, but insisted that the cargo should be completed, and the vessel should proceed to perform the voyage, and that the freight should be paid, both of which H G, and the plaintiff, refused to do. *Held*, that the defendant had no lien on the tobacco for freight, no freight being in fact due before the commencement of the voyage; and that if an injury had been sustained by the owner of the vessel, in consequence of a violation of the contract on the part of H G, the proper remedy was to be sought by an action against him.

*Mactier,* on the 17th of May 1800, at the city of *Balti-more,* entered into an agreement with *Howes Goldsborough,* that a charter party should be drawn between them for the Snow *Maryland,* Capt. *Thos. Burgess,* from *Balti-more* to *Amsterdam,* for and in consideration of 6,500 Spanish milled dollars, payable on her delivering the car-go at the said port.   In pursuance of this agreement, *Goldsborough* afterwards put on board the Snow, at the city of *Baltimore,* the tobacco mentioned in the declara-tion, and after lading the tobacco, to wit, on the 30th of May 1800, sold the same to the plaintiff, and gave an or-der on the defendant, who was the master of the Snow, to deliver the tobacco to the plaintiff.   This order the de-fendant refused to comply with, and the plaintiff sued forth the present writ of replevin.   In pursuance of said agree-ment a charter party was drawn up and approved by both parties, who agreed to sign it.   *Goldsborough* afterwards, and after the lading the tobacco on board the Snow, in pur-suance of said agreement sent for the charter party so drawn up, and had it in his custody with a view to sign it, but instead of signing it, he afterwards wholly refused to sign it, in consequence of his having failed, and trans-ferred as before stated, the tobacco to the plaintiff, and destroyed the charter party; and that the charter party was never executed.   Before and after the sale of the tobacco to the plaintiff, *Alexander Mactier,* and the defendant, and the Snow, were at all times ready to take on board any cargo which *Goldsborough* might chuse to put on board; but that after having put on board the tobacco, and certain other goods, he wholly refused and neglected to put on board any further cargo.   The Snow was in all respects prepared to sail her said voyage, as related to the part to be performed by *Mactier,* except the shipping of her hands, and her clearance, both which *Mactier* was ready and wil-ling to have done as soon as *Goldsborough* should com-plete the lading of the cargo; and that it was always the practice in the port of *Baltimore* to ship hands, and clear out the vessel, after the cargo is put on board.   The goods, which had been put on board, were not a full lading for the Snow, and were not the whole of the cargo intended to be put on board by *Goldsborough,* and that he did not order, nor wish the Snow to sail on the said voyage with the cargo then on board; and that he assigned the tobacco

to the plaintiff, in payment of a debt contracted for the purchase of the same tobacco from the plaintiff, and abandoned altogether any further connexion or concern in said intended voyage, or the property laden on board the Snow, and refused to complete the lading of the Snow, which was to have been performed by him previous to her sailing; and that the Snow was prevented from sailing on said voyage, for the purpose of delivering the cargo at *Amsterdam*, solely by the acts of *Goldsborough* and the plaintiff; and that the defendant, as master of the Snow, and the agent of *Mactier*, did refuse to deliver the tobacco in pursuance of the herein before recited order of *Goldsborough*; but insisted, that the cargo should be completed, and the vessel should proceed to perform the voyage according to said agreement, and that the freight should be paid; both of which *Goldsborough* and the plaintiff absolutely refused on their part. The Snow never sailed on the said voyage. After the tobacco was taken under the present writ, out of the Snow, and *Goldsborough* and the plaintiff had so refused to permit her to proceed on her voyage, *Mactier* did, on the 19th of June 1800, sell the Snow to *Robert Gilmor* & Sons. *Mactier*, before the agreement herein before stated between him and *Goldsborough*, expended a considerable sum of money in preparing the Snow for a voyage on the high seas. Upon these facts, the plaintiff prayed the opinion of the court, and their direction to the jury, that he was entitled to recover. This direction the court, [*Nicholson* Ch. J.] gave, being of opinion that the defendant had no lien on the goods for freight, no freight being in fact due before the commencement of the voyage; and that if injury had been sustained by the owner of the Snow, in consequence of a violation of the contract on the part of *Goldsborough*, the proper remedy was to be sought by an action against him. The defendant excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before POLK, BUCHANAN, EARLE, and JOHNSON, J.

*Harper* and *Winder*, for the Appellant, cited 1 *Esp. Dig.* 146. *How vs. Beech*, 3 *Lev.* 244. *Winter vs. Foweracres*, 2 *Roll. Rep.* 39. *Co. Litt.* 209, a. *Hurford vs.*

1811.

Roseberry
vs
Seney

Peter, Cro. Jac. 433. Touteng vs. Hubbard, 3 Bos. & Pull. 295, 296, (note;) and 1 Com. on Cont. 354, p. Lawrence, J.

Martin and W. Dorsey, for the Appellee, cited Smith vs. Wilson, 8 East, 437. Molloy, 370; and Curling vs. Long, 1 Bos. & Pull. 634.

JUDGMENT AFFIRMED.

---

Dec. (E S.) ROSEBERRY & STEVENS vs SENEY, et al. Lessee.

If the term of a demise in the declaration in an action of ejectment, expired before the verdict and judgment in the court below, the judgment is erroneous, and on appeal will be reversed.

In such a case the court below, under a procedendo directing a new trial, may enlarge the term of the demise.

Where the plaintiff in ejectment gave in evidence a certificate of survey of the land for which the action was brought called Notlar's Desire, made for N C in 1685, without showing a patent for the land; also a deed from R C to M F, dated in 1729, for part of a tract of land called Notley's Desire.——Held, that the deed could not be read in evidence.

If a deed from H to N for part of a tract of land, has been located on the plots, then a deed from H and N to J, for the same part of the said tract of land, need not also be located.

APPEAL from Queen-Anne's County Court. Ejectment for a tract of land called Notlar's Desire, containing 198 acres, on a joint demise by the lessors of the plaintiff, (now appellee,) for six years from the 1st of March 1801. Defence was taken on warrant, and plots were made.

1. At the trial in October 1809, the plaintiff, in deducing his title to the land for which the action was brought, offered in evidence the certificate of the tract of land called Notlar's Desire, containing 198 acres, made for Nicholas Clouds, on the 4th of July 1685, without showing a patent for the tract called Notlar's Desire. He then offered in evidence an instrument of writing, purporting to be a deed of bargain and sale from Richard Clouds to Michael Fling, dated the 5th of August 1729, for 38 acres, described by metes and bounds, being part of a tract called Notley's Desire. The defendants, (the appellants,) objected to the reading of this paper to the jury, and prayed the court to reject the same. But the Court, [Purnell and Worrell, A. J.] was of opinion that it was proper and legal evidence, and admitted it to be read. The defendants excepted.

2. The plaintiff then gave in evidence sundry mesne conveyances from Nicholas Clouds, for whom the survey of Notlar's Desire was made, to Joshua Seney, the father of the lessors of the plaintiff, and from whom it was admitted that they claimed by descent. The plaintiff had located on the plots in the cause the deed from Richard Clouds to Michael Fling. He had also located a deed from Thomas Hamer to David Nevill, dated the 17th July 1788, for three and a half acres, described by courses and distances, part of a tract called Notley's Desire; but had not located